UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DENNIS MARTIN, VINCENT RUZIAK, GREG DOMINIQUE, KEVIN FLANAGAN, ANDREW BELLANY, SCOTT MCADOO, and COREY SCAFIDI,**<br><br>**Plaintiffs**<br><br>**v.**<br><br>**SHAWN JENKINS, in his individual capacity and, for injunctive Relief, in his official capacity as Commissioner of the Massachusetts Department of Correction, and CHERYL VAN SCYOC, in her individual capacity and, for Injunctive Relief, in her official capacity as the Executive Director of Human Resources for the Massachusetts Department of Correction,**<br><br>**Defendants.** | **Case No. 25-cv-13254-DJC** |

## <u>MEMORANDUM AND ORDER</u>

**CASPER, C.J.**                                                                 **July 10, 2026**

## I.    Introduction

Plaintiffs Dennis Martin ("Martin"), Vincent Ruziak ("Ruziak"), Greg Dominique ("Dominique), Kevin Flanagan ("Flanagan"), Andrew Bellany ("Bellany"), Scott McAdoo ("McAdoo") and Corey Scafidi ("Scafidi") (collectively, "Plaintiffs") have filed this lawsuit against Defendants Shawn Jenkins ("Jenkins") and Cheryl Van Scyoc ("Van Scyoc") (collectively, "Defendants") asserting a claim under 42 U.S.C. § 1983 for retaliation against Plaintiffs for their exercise of their First Amendment rights.  D. 1.  Defendants now move to dismiss the complaint. D. 6.  For the reasons stated below, the Court DENIES the motion.

## II.    Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Reading the complaint "as a whole," the Court conducts a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the complaint to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while legal conclusions are not entitled to credit. Id. Second, the Court must determine whether the factual allegations support a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).

In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted). "To avoid dismissal, a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. at 102 (quoting Fed. R. Civ. P. 8(a)(2)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (alteration in original) (quoting Twombly, 550 U.S. at 557). "In determining whether a complaint crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'" García-Catalán, 734 F.3d at 103 (alteration in original) (quoting Iqbal, 556 U.S. at 679).

### III.    Factual Background

The Court draws the following, alleged facts from the complaint and exhibit appended thereto, D. 1, as well as the relevant portions of the Rules and Regulations Governing All Employees of the Massachusetts Department of Correction ("DOC") (the "Blue Book"), submitted by Defendants as an exhibit to their motion, D. 7-3, as they were fairly incorporated into the complaint.  See D. 1 ¶ 70.

### A.    The Parties

All parties are employed by DOC.  Plaintiffs are DOC corrections officers and members of the Executive Board (the "Board") of the Massachusetts Correction Officers Federated Union ("MCOFU"), which is the collective bargaining representative of DOC employees in statewide bargaining unit 4.  D. 1 ¶¶ 3-9.  Martin, the MCOFU President, has been employed by DOC since 1996.  Id. ¶ 3.  Ruziak, the Vice President, has been employed by DOC since 1995.  Id. ¶ 4.  Dominique, the Executive Secretary, has been employed by DOC since 2011.  Id. ¶ 5.  Flanagan, the Legislative Representative, has been employed by DOC since 2000.  Id. ¶ 6.  Bellany, the Grievance Coordinator, and McAdoo, the Treasurer, have been employed by DOC since 2007.  Id. ¶¶ 7-8.  Scafidi, the Business Agent, has been employed by DOC since 2005.  Id. ¶ 9.  Plaintiffs do not have policymaking or confidential roles within DOC and their job responsibilities do not include speaking to the public on DOC's behalf.  Id. ¶¶ 71, 81.

Defendants are high-ranking DOC officials.  Id. ¶ 1.  Jenkins is the Commissioner, and by virtue of his position he is authorized to discipline correction officers in some circumstances.  Id. ¶ 11.  Van Scyoc is the Executive Director of Human Resources.  Id.

At times prior to September 18, 2024, the Board expressed concerns to DOC management about increasing inmate violence and what the Board perceived as DOC's lack of preparedness.  Id. ¶ 15.  Among other concerns, the Board had raised their belief that some inmates had

3

disassembled tablet computers issued to them and fashioned parts into knife-like weapons. Id. DOC allegedly did not address the concerns raised by the Board. Id.

On the evening of September 18, 2024, three inmates at Souza-Baranowski Correctional Center ("Souza-Baranowski"), a maximum-security DOC facility, violently attacked a corrections officer. Id. ¶ 12. One inmate stabbed the officer multiple times with a sharp object. Id. Other officers responded and took the inmates into custody. Id. In total, five corrections officers were injured. Id. ¶ 14. The attack was captured on DOC's closed-circuit video camera system. Id. ¶ 13.

### B.      Press Coverage of the Attack

Later on September 18, 2024, DOC issued a press release about the attack. Id. ¶ 16. In the press release, DOC informed the public that it had received a report of multiple injured officers at 6:20 p.m., that two officers were stabbed and assaulted by inmates and three others were injured in responding and that the five injured officers had been taken to area hospitals. Id. The same evening, "without advance DOC permission," Martin "made statements . . . that were recorded by the media." Id. ¶ 17. Ruziak also made remarks without DOC's permission, id. ¶¶ 30-31. MCOFU also published a post about the attack on its Facebook page. Id. ¶ 24.

That night and in the days that followed, the attack became subject of widespread press coverage. Id. ¶¶ 17-33. Locally, Boston's NBC News affiliate ("NBC10") televised a segment hours after the attack, which included the information in DOC's press release and that DOC had notified the State Police. Id. ¶ 18. The following morning, on September 19, 2024, Martin held a press conference on behalf of MCOFU regarding the attack. See id. ¶¶ 20-21, 23. As with his

comments the prior evening, Martin "did not have advance permission" from DOC to speak with the media that morning.  Id. ¶¶ 21, 29.[1]

NBC10 aired a second segment on September 19, 2024, in which it reported that MCOFU had been "sounding the alarm" regarding dangerous conditions at Souza-Baranowski prior to the attack.  Id. ¶¶ 19, 22.  This segment contained a portion Martin's press conference and included his description of the details of the attack and a photograph of one officer's injuries.  Id. ¶ 20. Additionally, among other things, the segment featured MCOFU-provided photographs of weapons allegedly confiscated from Souza-Baranowski inmates and discussed MCOFU's belief regarding the inmates' tablet computers.  Id. ¶ 22.  The segment also noted that DOC had announced that the attackers were transferred from Souza-Baranowski to another prison.  Id.  Later on September 19, 2024, NBC10 televised a third segment about the attack, which included Martin's press conference in its entirety.  Id. ¶ 23.  NBC10 also published an article about the attack on its website.  Id. ¶ 24.

Additional local stations televised segments regarding the attack on September 19, 2024. Coverage from WBZ CBS News Boston ("WBZ") included statements from Martin's press conference and the MCOFU-provided injury photograph.  Id. ¶ 25.  WBZ also published an article on its website, which quoted Martin's press conference.  Id. ¶ 26.  A segment from News 7 Boston ("7News") included excerpts of Martin's September 18 comments.  Id. ¶ 27.  7News reported that DOC planned to review DOC's closed-circuit video footage of the attack.  Id.  An article published on the 7News website contained similar information.  Id. ¶ 28.  A broadcast by Boston's ABC affiliate included footage of remarks by Martin, Ruziak and others, and the reporter noted, *inter*

---

[1] Although Martin and Ruziak spoke to the press without authorization, they have not been disciplined for same.  Id. ¶¶ 21, 29, 31.

*alia*, that he had spoken to state lawmakers who were seeking to have DOC remove tablet computers from inmates. Id. ¶ 30. Local public media published an article online that included state lawmaker commentary critical of DOC. Id. ¶ 32.

### C.    Release of the Video

The Board received a copy of video footage of the attack captured on DOC's closed-circuit camera system (the "Video") and voted unanimously to release the footage. Id. ¶ 34. On September 20, 2024, Plaintiffs shared the Video and a written statement with media outlets, "to illustrate and amplify [Plaintiffs'] concerns that the DOC had failed to carry out its responsibility to provide for officer safety." Id. Local media coverage featured, *inter alia*, the Video, Plaintiffs' accompanying statement and/or comments from public officials regarding DOC officer safety. Id. ¶¶ 35-43, 46. Plaintiffs believe that DOC did not seek to prevent or remove media publication of the Video. See id. ¶ 44.

### D.    Events Following the Attack

Less than a week after the September 18, 2024, attack, the three inmates involved were criminally charged in Worcester County. Id. ¶ 47. Plaintiffs allege that DOC knew the inmates' identities shortly after the attack, as indicated by DOC's announcement on September 19 that the inmates had been transferred to other DOC facilities. Id. ¶¶ 22, 48. Local media reported that the inmates had been charged, and some of the coverage included the Video. Id. ¶¶ 49-57. Some reporting included statements by Jenkins. Id. ¶¶ 50, 52, 54, 57. Three state lawmakers, in a letter to the governor, requested action to increase safety at DOC facilities, including Souza-Baranowski, id. ¶ 58, and such requests to the governor were also reported in other media outlets, id. ¶ 59. Further media coverage in October 2024, after the inmates were indicted, included the Video. Id. ¶¶ 60-62. Some media coverage regarding the inmates' arraignments in January 2025 included

links to access the Video, and some included contemporaneous comments from Martin. Id. ¶¶ 63-68.

**E.       Alleged Retaliation Against Plaintiffs**

On June 24, 2025, DOC suspended Plaintiffs for five days for releasing the Video to the media. See id. ¶ 69; id. at 25-26.[2] Van Scyoc notified Plaintiffs of their suspensions by identical discipline letters, but Plaintiffs allege that Jenkins made the decision. Id. ¶ 69. The discipline letters stated that Plaintiffs had violated Rule 3(c) of the Blue Book, which provides that any "release of confidential information by an employee to unauthorized sources shall be considered cause for disciplinary action, including immediate dismissal or suspension." Id. ¶ 70; id. at 25; see D. 7-3 at 4-5. The discipline letters also invoked "103 CMR 131 News Media Relations and 103 DOC 154 CORI Regulations." D. 1 at 25; see id. ¶ 70.[3] Before imposing discipline on Plaintiffs, Defendants never asserted that release of the Video impeded any investigation into the attack, impeded DOC operations, negatively impacted DOC's ability to maintain discipline or relationships in the workplace, impaired Plaintiffs' abilities to perform their job duties, impaired DOC's workplace harmony or was inherently disruptive. Id. ¶¶ 72, 74, 77-80.

---

[2] Although Plaintiffs allege that MCOFU and certain Plaintiffs engaged in other speech regarding the attack, they contend that they were disciplined "solely and exclusively because they had collectively released the [Video] to the media." D. 1 ¶ 69.

[3] "CORI" refers to criminal offender record information, the disclosure of which is subject to restrictions under Massachusetts law. See Mass. Gen. L. c. 6, §§ 167, 172. Plaintiffs erroneously allege that the letter cites "103 CMR 154 CORI Regulations." D. 1 ¶ 70. Instead, the letter and Blue Book both cite "103 DOC 154 CORI Regulations." Id. at 25; D. 7-3 at 5. 103 DOC 154 is a DOC records policy. DOC has a separate policy titled "CORI Regulations," which is instead found at 103 DOC 153. The complaint's reference to "103 CMR 141 News Media," D. 1 ¶ 70, also misreads the letter and Blue Book, which cite 103 Code Mass. Regs. § 131, D. 7-3 at 5; D. 1 at 25. DOC's media regulations provide, *inter alia*, that it is DOC's general policy "not to comment on on-going or pending investigations involving inmates and/or employees in order to protect the integrity of the investigation." 103 C.M.R. § 131.07(3).

7

As alleged, "Plaintiffs believed it was important that the public know that armed attacks could happen in DOC facilities, that officers and inmates alike were vulnerable to serious injuries in such attacks, and that the DOC had taken inadequate steps, despite warnings from the union, to prevent such attacks." Id. ¶ 71. Plaintiffs further allege that the Video contained no confidential information because DOC had already publicly disclosed the underlying facts. Id. ¶ 75.

## IV. Procedural History

Plaintiffs initiated this action on November 5, 2025. D. 1. Defendants now move to dismiss the complaint. D. 6. The Court heard the parties on the pending motion and took the matter under advisement. D. 12.

## V. Discussion

Defendants offer four arguments that Plaintiffs fail to state a claim for which relief can be granted. First, Defendants contend that Plaintiffs were acting as public employees rather than private citizens in releasing the Video to the media. D. 7 at 8-11. Second, Defendants argue that Plaintiffs were not speaking on a matter of public concern. Id. at 11-14. Third, Defendants contend that they had an adequate justification for disciplining Plaintiffs for their speech. See id. at 14-18. Finally, Defendants maintain that even if Plaintiffs plausibly allege a First Amendment retaliation claim, the complaint must be dismissed because Defendants are entitled to qualified immunity. Id. at 19-20.

### A. First Amendment Retaliation, 42 U.S.C. § 1983

Generally, "[c]laims of retaliation for the exercise of First Amendment rights are cognizable under § 1983." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 9 (1st Cir. 2005) (alteration in original) (citation omitted). Where a public employee contends that his government employer took an adverse employment action that violated his First Amendment rights, the First Circuit has articulated a three-part inquiry. Decotiis v. Whittemore, 635 F.3d 22,

29 (1st Cir. 2011).  First, the Court "must determine whether the employee spoke as a citizen on a matter of public concern" and, second, "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. (alterations in original) (internal citation and quotation marks omitted).  These first two elements are typically questions of law to be decided by the Court.  See Guilloty Perez v. Pierluisi, 339 F.3d 43, 51 (1st Cir. 2003).  If they are established, the analysis turns to the third element, wherein "the employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision."  Decotiis, 635 F.3d at 29 (internal citation and quotation marks omitted). Even then, "the employer may still escape liability if it can show that it would have reached the same decision even absent the protected conduct." Id. at 30 (internal citation and quotation marks omitted); but see Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 140 (1st Cir. 2022) (questioning whether this consideration is distinct from the "substantial or motivating factor" prong).  Defendants challenge the first and second elements.  See D. 7 at 7-8.

1.     Private Citizen Speech on a Matter of Public Concern

The First Amendment distinguishes between a public employee's citizen speech, which can trigger protection, and employee speech, which may be disciplined by the employer.  Lane v. Franks, 573 U.S. 228, 237 (2014).  "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Id. at 240.  In considering this question, the First Circuit has identified several non-exclusive factors, including "whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it

'official significance'); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech." Gilbert v. City of Chicopee, 915 F.3d 74, 82 (1st Cir. 2019) (quoting Decotiis, 635 F.3d at 32).  In addition to speaking in a private citizen capacity, plaintiffs claiming First Amendment retaliation must allege that they were speaking on a matter of public concern.  See Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (explaining that inquiries are distinct).  At the motion to dismiss stage, the protected nature of the speech need only be plausibly alleged, not conclusively established.  See Decotiis, 635 F.3d at 34-35.

As to whether Plaintiffs were speaking as private citizens or public employees when they released the Video, Defendants eschew discussion of Plaintiffs' responsibilities as DOC employees and instead proceed from the erroneous premise that the only responsibilities relevant to this inquiry are Plaintiffs' responsibilities as members of MCOFU leadership.  See D. 7 at 8-11; see, e.g., id. at 10 (arguing that "Plaintiffs were acting pursuant to their official duties in representing the MCOFU membership when they released the [Video]"); id. at 11 (discussing "Plaintiffs' primary duties as . . . Board members").  As an initial matter, Defendants' argument relies upon extrinsic material, a page from the MCOFU website, that does not fall into an exception allowing the Court to consider it in resolving Defendants' motion to dismiss.  See D. 7 at 9 (citing D. 7-2); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (addressing documents the court can consider at motion to dismiss stage).  More fundamentally, Defendants offer no explanation for why these duties, rather than Plaintiffs' duties as DOC correction officers (i.e., their public employment) would govern the First Amendment analysis, see id. at 9-11, and the Court rejects

this unexplained contention.[4]  See Decotiis, 635 F.3d at 30 (discussing "employment duties" as informing this inquiry); see, e.g., Bruce, 34 F.4th at 136-37 (concluding that employee was speaking as citizen, including where jury could find that employee was identified as union president in news interview and that his speech derived from common sense or union service rather than knowledge gained through employment);[5] see also Janus v. AFSCME, Council 31, 585 U.S. 878, 910 (2018) (explaining in different context that "[w]hen an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer," but "when a union negotiates with the employer or represents employees in disciplinary proceedings, the union speaks for the employees, not the employer" (emphasis in original)). Accordingly, the Court will not dismiss the complaint on this basis.

To state a claim, Plaintiffs also must have spoken on a matter of public concern.  "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  Lane, 573 U.S. at 241 (internal citation and quotation marks omitted); see City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004) (per curiam).  "Whether an employee's speech involves a 'matter of public concern' is a case-specific, fact-dependent inquiry."  Curran, 509 F.3d at 46.  Although the First Circuit has suggested that the content of the speech "is pre-eminent" in this analysis, form and

---

[4] To the extent that at the motion hearing, counsel for Defendants suggested for the first time that Plaintiffs' only role as DOC employees is to serve in their Board capacity, Plaintiffs have alleged that they are correction officers, see D. 1 ¶¶ 3-9, which Defendants have echoed, see D. 7 at 11.

[5] As Plaintiffs recognize, see D. 8 at 9 n.12, the First Circuit has not set a bright line that, in all circumstances, "a public employee is not speaking pursuant to his official duties – and is instead speaking in his capacity as a citizen – whenever the employee is speaking, even at work, as an official of the employee's union."  See Bruce, 34 F.4th at 136.  Instead, it has considered the fact-specific circumstances in making such determination in a particular case.  Id.

context are also relevant if the content does not indicate that the speech is on a matter "of inherent public concern."  See Davignon v. Hodgson, 524 F.3d 91, 101 (1st Cir. 2008); see also Decotiis, 635 F.3d at 30 (identifying "official malfeasance or the neglect of duties" as inherently of public concern); Alston v. Town of Brookline, 997 F.3d 23, 48 (1st Cir. 2021) (noting that "the right to protest discrimination" is of inherent public concern).  That said, "no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said."  Snyder v. Phelps, 562 U.S. 443, 454 (2011).  Matters of public concern are typically those "concerning government policies that are of interest to the public at large, a subject on which public employees are uniquely qualified to comment."  Roe, 543 U.S. at 80.

Defendants argue that the content of the Video does not suggest that Plaintiffs' speech was on a matter of public concern because it "does not reflect any actions or inactions by DOC in response to the [Board's] stated concerns" or any failure by DOC to prioritize staff safety.  See D. 7 at 12-13.  Drawing reasonable inferences in Plaintiffs' favor, however, the Video does plausibly "reflect" concerns the Board had expressed to DOC, including about DOC inmates' abilities to fashion sharp weapons.  See D. 1 ¶¶ 12, 15, 30.  While the Court is inclined to agree that the content of the Video may implicate "an internal workplace grievance," see D. 7 at 13, that characterization would not be fatal to Plaintiffs' claim, because "speech on internal working conditions may rise to the level of public concern if the community has in fact manifested a legitimate concern in the internal workings of the particular agency" and "the form of the employee's expression suggests a subjective intent to contribute to any such public discourse." Tripp v. Cole, 425 F.3d 5, 12 (1st Cir. 2005) (internal citation and quotation marks omitted); see Baron v. Suffolk Cnty. Sheriff's Dep't, 402 F.3d 225, 233-35 (1st Cir. 2005) (recognizing that some speech about internal working conditions qualifies as speech on matters of public concern),

abrogated on other grounds, Jennings v. Jones, 587 F.3d 430, 438 n.10 (1st Cir. 2009); cf. Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 35 (1st Cir. 2020) (reiterating that "a complaint regarding personal animosity between coworkers" is speech on internal working conditions that does not concern the public); Meaney v. Dever, 326 F.3d 283, 289 (1st Cir. 2003) (noting that "conduct intended to express anger at a supervisor towards whom one bears personal animosity because of family history and/or a prior personnel decision does not relate to a matter of public concern").

The form and context of the speech support a conclusion that Plaintiffs spoke on a matter of public concern. The attack was already the subject of media attention before Plaintiffs released the Video, see Rankin v. McPherson, 483 U.S. 378, 386-87 (1987) (concluding that context of speech "disclose[d] that it plainly dealt with a matter of public concern" where it "was made in the course of a conversation addressing the policies of the President's administration" and "came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President"), and Plaintiffs released the Video "to numerous media outlets in order to illustrate and amplify [Plaintiffs'] concerns that the DOC had failed to carry out its responsibility to provide for officer safety," D. 1 ¶ 34; cf. Roy v. Correct Care Sols., LLC, 914 F.3d 52, 73 (1st Cir. 2019) (noting, as to form, that failure to inform public may cut against conclusion favorable to plaintiff regarding public concern).

Based on the factual allegations, and drawing all reasonable inferences in Plaintiffs' favor, the complaint alleges sufficient facts to make it plausible that Plaintiffs spoke on a matter of public concern. See Decotiis, 635 F.3d at 34-35; see, e.g., Kimbrough v. Bucks County, 763 F. Supp. 3d 700, 710 (E.D. Pa. 2025) (concluding that correctional facility employee's speech "implicated a matter of public concern because he shared information about understaffing, mismanagement, and

jail security that related to a high-profile lawsuit against his employer," which was of legitimate news interest); cf. Brooks v. Arthur, 685 F.3d 367, 372-75 (4th Cir. 2012) (concluding that corrections officer's complaints about workplace did not touch on a matter of public concern, where issues were "not expressed in terms of a breakdown in effective prison management, but rather focused on his personal displeasure with his supervisors"). Accordingly, the Court will not dismiss the complaint on this basis.

2.       *Pickering* Balancing Test

The second factor in the First Amendment retaliation inquiry, often referred to as the Pickering balancing test, asks whether "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Bruce, 34 F.4th at 135 (quoting Curran, 509 F.3d at 45); Pickering v. Bd. of Educ., 391 U.S. 563, 572-73 (1968). The Court "attempts to balance the value of an employee's speech—both the employee's own interests and the public's interest in the information the employee seeks to impart—against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." Decotiis, 635 F.3d at 35 (internal citation and quotation marks omitted). "[T]he stronger the First Amendment interests in [an employee's] speech, the stronger the justification the employer must have." Curran, 509 F.3d at 48 (citing Connick v. Myers, 461 U.S. 138, 150 (1983)). "[I]nsofar as self-interest is found to have motivated public-employee speech, the employee's expression is entitled to less weight in the Pickering balance than speech on matters of public concern intended to serve the public interest." O'Connor v. Steeves, 994 F.2d 905, 915 (1st Cir. 1993); see Khudaynazar v. City of Boston, No. 25-cv-12696-ADB, 2026 WL 289518, at *10 (D. Mass. Feb. 3, 2026); but see Curran, 509 F.3d at 48 n.9 (suggesting that it "may not be appropriate to evaluate the value of [an

14

employee's] speech to the public by looking at whether plaintiff's motives were good, bad, or indifferent").

In assessing the government employer's interest, the Court must consider (1) "the time, place, and manner of the employee's speech," and (2) "the employer's motivation in making the adverse employment decision." Decotiis, 635 F.3d at 35 (quoting Davignon, 524 F.3d at 104). Where a government employer is a law enforcement agency, this can "heighten[ ] the governmental interest" in the balancing test, see Curran, 509 F.3d at 50, at least as to the employer's concerns about disruption to order, loyalty, morale, harmony and impairment of the public's trust, see id.; Guilloty Perez, 339 F.3d at 53-54 (noting that the "importance of discipline, maintenance of harmony among co-workers, and close working relationships requiring personal loyalty and confidence is greater in the context of a law enforcement agency"); McGunigle v. City of Quincy, 132 F. Supp. 3d 155, 172-73 (D. Mass. 2015) (describing police department's interests in obedience, loyalty, discipline, "in ensuring that the public perceives its law enforcement polic[i]es to be even-handed and fair" and "in setting enforcement priorities and ensuring that those priorities are implemented in a fair and sensible manner"), aff'd on other grounds, 835 F.3d 192 (1st Cir. 2016); Davignon, 524 F.3d at 104 (noting that, "[p]utting aside practical distinctions between correctional facilities and police departments, the importance of safety within correctional facilities cannot casually be dismissed"). An employer's interest is weakened when its action adverse to the employee is "entirely out of self-interest to silence legitimate criticism." Jordan v. Carter, 428 F.3d 67, 74 (1st Cir. 2005). In addition to an actual adverse effect of speech, an employer may rely upon its reasonable concerns about disruption, see Curran, 509 F.3d at 49-50, in which case its "prediction of disruption must be reasonable based upon the record," MacRae v. Mattos, 106 F.4th 122, 138 (1st Cir. 2024); see Bruce, 34 F.4th at 139 (noting that court has not

15

allowed employers "to use the potential for speech to cause disruption as a post hoc rationalization").

As Plaintiffs point out, see D. 8 at 17, the fact-intensive Pickering inquiry "does not easily lend itself to resolution on a motion to dismiss." Khudaynazar, 2026 WL 289518, at *10; Dusenberry v. Massachusetts, 676 F. Supp. 3d 50, 52 (D. Mass. 2023) (declining to engage in Pickering balancing "because it requires a fact specific balancing test that is not appropriate at this stage where mere allegations are taken as true" (emphasis omitted)); see Decotiis, 635 F.3d at 35-36 (explaining that at motion to dismiss stage, faced "with only the facts in the complaint," court could not say that government's interests outweighed plaintiff's); see also Brown v. City of Tulsa, 124 F.4th 1251, 1269 (10th Cir. 2025) (stating that at motion to dismiss stage, "information required to conduct Pickering balancing is generally accessible only to the employer"); Hernandez v. City of Phoenix, 43 F.4th 966, 979 (9th Cir. 2022) (noting that it "seem[ed] likely" that employee's social media posts "could impede the performance of his job duties and interfere with [his employer's] ability to effectively carry out its mission," but concluding that "no evidence of the actual or potential disruptive impact caused by [his] posts [was] properly before" the court at motion to dismiss stage). Even so, it is appropriate for the Court to examine the record to determine whether it reveals, even at this early stage, information that makes Pickering balancing possible and defeats the plausibility of Plaintiffs' claim. See Manchester v. Town of Ludlow, 780 F. Supp. 3d 296, 309 n.7 (D. Mass. 2025).

On Plaintiffs' side of the scale, they allege that they "believed it was important that the public know that armed attacks could happen in DOC facilities, that officers and inmates alike were vulnerable to serious injuries in such attacks, and that the DOC had taken inadequate steps, despite warnings from the union, to prevent such attacks." See D. 1 ¶ 71. To be sure, even as

alleged, this speaks partly to a self-interested motivation in improving Plaintiffs' working conditions, see id. ¶ 34, which may entitle their speech "to less weight in the Pickering balance," O'Connor, 994 F.2d at 915. Drawing reasonable inferences in Plaintiffs' favor, however, these alleged interests also speak to a desire to inform the public about potential government mismanagement contributing to safety issues for both DOC employees and inmates within DOC's control.

On the other side, Defendants argue that the Pickering balance tips in their favor because Plaintiffs' release of confidential material without authorization "could have compromised both DOC's investigation and the ongoing criminal prosecution of the [inmates] involved." See D. 7 at 16-18. The Supreme Court has recognized that an employee's violation of the employer's policy and the employee's disclosure of sensitive information are relevant to the Pickering inquiry. Connick, 461 U.S. at 153 & n.14 (noting that violation of "announced office policy" would strengthen employer's position (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 284 (1977))); Lane, 573 U.S. at 242 (concluding that Pickering balance favored employee and noting that there was no evidence speech "was false or erroneous or that [the employee] unnecessarily disclosed any sensitive, confidential, or privileged information while testifying").[6] Plaintiffs' response to Defendants' Pickering argument heavily focuses on the notion that, as alleged, their release of the Video caused no actual disruption at DOC. See D. 8 at 17-18. Even accepting that as true, the discipline letter invoked the "risk[]" that Plaintiffs' release of the Video posed to "public safety and the integrity of an on-going investigation." See D. 1 at 25; Curran,

---

[6] To the extent Defendants separately seek to rely upon a 2021 Board letter to members regarding contact with media, see D. 7 at 18 (citing D. 7-4), the Court is not persuaded that such material falls into an exception permitting the Court's consideration of same as to the pending motion to dismiss. See Watterson, 987 F.2d at 3.

509 F.3d at 47-48 (looking to "the employer's stated justifications . . . contained in the termination letter" at motion for judgment on the pleadings stage); cf. Davignon, 524 F.3d at 105 (expressing skepticism regarding argument that employer relied upon "speech's potential to disrupt when the suspension letters issued to plaintiffs refer[red] solely to the actual disruption the speech caused" (emphases in original)).   At this early stage, however, where the incomplete record renders the Court's inquiry into DOC's interests "relatively uninformed," see Decotiis, 635 F.3d at 36, Plaintiffs' allegations regarding the status of the investigation at the time they released the Video cut against this statement.  See, e.g., Bruce, 34 F.4th at 139 (noting that where potential disruption is basis for adverse employment action, court has "looked to the record to determine whether the potential for disruption was actually the reason for the [adverse action]").[7]

As the complaint acknowledges, D. 1 ¶ 70, the discipline letter also invoked a Blue Book rule prohibiting unauthorized release of confidential information and DOC policies regarding same, see id. at 25.[8]   Defendants rely upon three cases from other circuits in support of their argument that DOC's interests tip the scales here.  See D. 7 at 16-17 (citing Billioni v. Bryant, 998

---

[7] As Plaintiffs also noted, they were not disciplined until months after they released the Video and the attackers were arraigned.  See D. 8 at 17-18.  At this stage, the parties have not meaningfully engaged with the relevance of such a gap.  Compare MacRae, 106 F.4th at 140 (noting that defendants "were eminently reasonable in predicting disruption would be forthcoming if they did not act"), with Curran, 509 F.3d at 42, 45, 49-50 (concluding that "concerns about disruption were reasonable" where employee's termination "was the culmination of progressive discipline" and while suspended, employee made relevant speech, and employer informed him of disciplinary hearing three months later).

[8] This letter also refers to CORI, see D. 1 at 25; see D. 7 at 18.  Although Defendants are correct that "CORI law . . . supports criminals' rehabilitation and successful reentry into society through privacy protection," see id.; Gravito v. Commonwealth, 496 Mass. 756, 762-63 (2025), Defendants do not elaborate on why the Video consists of or contains CORI rather than, for instance, non-CORI "intelligence information," see Mass. Gen. L. c. 6, § 167; 103 C.M.R. §§ 131.06, 157.05, even considering counsel's clarification at the motion hearing that the Video shows the inmates' faces.  While DOC's release of intelligence or investigative information is also restricted by its regulations, see 103 Mass. Code Regs. § 131.07, Defendants make no argument about the applicability of that restriction here.

18

F.3d 572 (4th Cir. 2021); Magalis v. Adams, 879 F. Supp. 2d 976 (C.D. Ill. 2012); Hellman v. Weisberg, No. 06-cv-1465-PHX-FJM, 2007 WL 4218973 (D. Ariz. Dec. 3, 2007), aff'd, 360 F. App'x 776 (9th Cir. 2009)). Each case was decided at summary judgment, however, and as with courts in this Circuit, courts in the Fourth, Seventh and Ninth Circuits have recognized that Pickering balancing is often difficult at the motion to dismiss stage. See Beathard v. Lyons, 129 F.4th 1027, 1035 (7th Cir. 2025) (noting that Pickering balancing "is precisely the sort of matter that typically cannot be resolved on the pleadings"); Jensen v. Brown, 131 F.4th 677, 691 (9th Cir. 2025) (stating that "[w]here the facts alleged do not decisively indicate that the state's interest outweighs the plaintiff's, the Pickering balancing is generally deferred to at least the summary judgment stage"); Jones v. City of Greensboro, No. 24-cv-450, 2025 WL 969360, at *6 (M.D.N.C. Mar. 31, 2025) (stating that Pickering balancing "usually implicates fact questions appropriate for summary judgment" rather than motion to dismiss). Moreover, Plaintiffs have alleged that the Video "was not, nor did it contain, confidential information but rather was a video depiction of facts that the DOC or other entities had already disclosed to the public" and that "DOC never sought to have [it] removed from media circulation." See D. 1 ¶ 75. Particularly in light of the undeveloped record and argument regarding Defendants' interests, including the scope of DOC restrictions applicable to the Video, see, e.g., Hawkins v. District of Columbia, 923 F. Supp. 2d 128, 142-43 (D.D.C. 2013) (concluding that alleged violation of police department policy tipped in employee's favor because department "seem[ed] to have misapplied its own [policy] in disciplining [plaintiff]"); Barry v. Luzerne County, 447 F. Supp. 2d 438, 447 n.1 (M.D. Pa. 2006) (declining to consider effect of alleged prison policy restricting dissemination of information where defendants had not provided evidence that policy existed "or to what activity it applied"), the Court cannot say that Plaintiffs have failed to plead facts sufficient to allow the Court to infer

that their claim could survive the <u>Pickering</u> balancing test.  <u>See, e.g.</u>, <u>McVeigh v. Kelly</u>, __ F. Supp. 3d __, 2026 WL 1079693, at *2-3 (N.D. Fla. Apr. 15, 2026) (concluding that plaintiff had "allege[d] sufficient facts to allow the court to draw the inference that he could survive the balancing").[9]

### B.      <u>Qualified Immunity</u>

For similar reasons, the Court rejects Defendants' argument that the complaint should be dismissed on qualified immunity grounds.  Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>see</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009).  In determining whether a government official is entitled to qualified immunity, the Court must determine:  (1) "whether the plaintiff's version of the facts makes out a violation of a protected right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  <u>Alston</u>, 997 F.3d at 50 (quoting <u>Alfano v. Lynch</u>, 847

---

[9] Of course, on a more developed record, Defendants may have the better position.  <u>See, e.g.</u>, <u>Dixon v. Kirkpatrick</u>, 553 F.3d 1294, 1306-09 (10th Cir. 2009) (concluding that executive director of agency was entitled to summary judgment, and noting that it "does not follow from the fact that agencies or heads of agencies must sometimes provide information to the public about investigations that low-level employees who have access to confidential materials may take it upon themselves to reveal information about investigations"); <u>Kimbrough v. Bucks County</u>, No. 24-cv-4470-KSM, 2026 WL 900522, at *9-12 (E.D. Pa. Mar. 30, 2026) (granting summary judgment for county and noting that it was "of little moment" whether details correctional facility employee divulged to third party were technically "confidential" because county reasonably expected "employees not to casually divulge sensitive information"); <u>Collins v. Gusman</u>, No. 14-cv-234, 2015 WL 1468298, at *4-6 (E.D. La. Mar. 30, 2015) (granting summary judgment for sheriff where deputy provided crime scene photograph to outside organization to shed light on allegedly poor prison conditions, which violated multiple department policies and caused disruptions); <u>Delano v. City of Buffalo</u>, 45 F. Supp. 3d 297, 307-08 (W.D.N.Y. 2014) (granting summary judgment for police commissioner where detective "[spoke] to the media in contravention of direct orders" and "supplied departmental photographs and videos to the media in violation of yet more regulations"), <u>aff'd</u>, 626 F. App'x 23 (2d Cir. 2015).

F.3d 71, 75 (1st Cir. 2017)).  As to the second determination, "[t]he question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted."  Alfano, 847 F.3d at 75.  This second prong has two aspects:  "whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right," and "whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right."  Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016) (quoting Mlodzinski v. Lewis, 648 F.3d 24, 32-33 (1st Cir. 2011)).

"It is not always possible to determine before any discovery has occurred whether a defendant is entitled to qualified immunity," although the defense can be evaluated "on a motion to dismiss when the complaint provides all of the facts needed to assess the plaintiff's claim."  Giragosian v. Bettencourt, 614 F.3d 25, 29 (1st Cir. 2010).  "Because qualified immunity is an affirmative defense to liability, the burden is on the defendants to prove the existence of circumstances sufficient to bring the defense into play," Alston, 997 F.3d at 50, which "shifts the burden to come forward with clearly established law onto the opponent," see Clemente Props., Inc. v. Pierluisi-Urrutia, 165 F.4th 1, 45 (1st Cir. 2026); Decotiis, 635 F.3d at 37 (stating that "for [a] right to be clearly established, [a] plaintiff must point to controlling authority or a body of persuasive authority, existing at the time of the incident, that can be said to have provided the defendant with 'fair warning'").

As an initial matter, Plaintiffs contend that "[i]nsofar as [they] seek injunctive relief as well as damages, the defense of qualified immunity is unavailable."  D. 8 at 18.  To the extent Plaintiffs argue that qualified immunity is not a defense to their claim against Defendants in their official capacities for injunctive relief, see D. 1 at 1, 23, the Court agrees.  This does not, however, prevent

Defendants from asserting the defense insofar as Plaintiffs seek monetary damages from Defendants in their individual capacities, see id.; Knowlton v. City of Wauwatosa, 119 F.4th 507, 519 (7th Cir. 2024) (stating that "[i]n an individual capacity suit, a plaintiff may only seek monetary damages; in an official capacity suit, a plaintiff may only seek injunctive or declaratory relief"), and the Court evaluates the defense to that extent.[10]

As to the merits, Defendants argue that they are entitled to qualified immunity because a "reasonable official in Defendants' positions would not believe they were violating the First Amendment when disciplining Plaintiffs because Plaintiffs had violated DOC policies and practices when they disclosed the [Video]." D. 7 at 19-20. It is true that in this context, the fact-intensive nature of the Pickering balancing test "makes it extremely difficult . . . to prove that [the relevant] right was clearly established at the time [the employee] was terminated." See Fabiano v. Hopkins, 352 F.3d 447, 457 (1st Cir. 2003); Díaz-Bigio v. Santini, 652 F.3d 45, 52-53 (1st Cir. 2011). In these circumstances, however, where Defendants' argument hinges on issues that the Court has already determined are underdeveloped at present, the Court cannot determine whether Defendants are entitled to qualified immunity. Accordingly, the Court declines to dismiss the individual-capacity claims against Defendants on such grounds. See, e.g., Riley v. City of Boston, No. 24-cv-11314-ADB, 2025 WL 1150744, at *9 (D. Mass. Apr. 18, 2025) (declining to dismiss First Amendment retaliation claim based on qualified immunity and noting that defendant could "raise th[e] defense again when the factual record has been more sufficiently developed"). See Wagner v. City Of Holyoke, 404 F.3d 504, 508-09 (1st Cir. 2005) (per curiam) (explaining that employer may argue that "use of . . . inappropriate means of expression" such as unlawful

---

[10] Defendants recognize that qualified immunity is designed to limit public officials' liability for damages, see D. 7 at 19, but do not acknowledge in their qualified immunity argument that Plaintiffs also seek injunctive relief in this case, see D. 1 at 23.

disclosure of information, "rather than the speech itself[,] prompt[ed] discipline," and discussing availability of qualified immunity).

## VI.      Conclusion

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss, D. 6.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

23